**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SANDY TSAI, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 4:14-CV-244 |
| | ) | |
| JERRY KARLIK, | ) | JURY TRIAL DEMANDED |
| KARGIL DEVELOPMENT PARTNERS, LLC, | ) | |
| KEITH GILES, | ) | |
| FRANKEL, GILES & ASSOCIATES, INC., | ) | |
| JORDAN KARLIK, | ) | |
| PICOULAS ENTERPRISES CORPORATION, | ) | |
| KGILES LLC, INC., | ) | |
| KARGIL BLUE ISLAND, LLC, and | ) | |
| SPIROS PICOULAS, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff SANDY TSAI ("Plaintiff" or "Tsai"), by their attorneys, Polsinelli PC, state as her Complaint against the defendants Kargil Blue Island, LLC, KGILES LLC, Inc., Frankel, Giles & Associates, Inc., Kargil Development Partners, LLC, Picoulas Enterprises Corp., Jerry Karlik, Keith Giles, Jordan Karlik, and Spiros Picoulas (collectively "Defendants") as follows:

**NATURE OF ACTION**

1.      Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs also seek to recover their attorney's fees and other costs incurred in this lawsuit.

2.      Plaintiff Sandy Tsai is a resident of St. Louis, Missouri and a Class A Member of 15th Street Blue Island, LLC.  As a Class A Member, Tsai invested $1,500,000 into the capital account of 15th Street Blue Island, LLC. The company was to use the funds that Tsai and the

other Class A Members invested to purchase a certain parcel of real estate located at 15th Street and Blue Island Avenue in the City of Chicago, Illinois, develop the property and construct a multi-unit mixed residential and retail commercial condominium building on it.

3.      Kargil Blue Island, LLC is the sole Class B member of 15th Street Blue Island, LLC and acted as 15th Street Blue Island, LLC's sole manager. Defendants Jerry Karlik, Keith Giles, Jordan Karlik, and Spiros Picoulas as members and/or representatives of Kargil Blue Island, LLC therefore had full control over the books and accounts of 15th Street Blue, Island, LLC.

4.      Between 2007 and 2013, Defendants used their affiliation with Kargil Blue Island, LLC to misappropriate, loot, and embezzle the assets of 15th Street Blue Island, LLC for the benefit of Frankel, Giles & Associates, Inc., KGILES LLC, Inc., Picoulas Enterprises Corp., Kargil Development Partners, LLC, Jerry Karlik, Keith Giles, Jordan Karlik, and Spiros Picoulas.

5.      This Complaint arises as a result of Defendants' fraudulent scheme.

## JURISDICTION AND VENUE

6.      The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff's cause of action is created by federal law.

7.      Pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. §1965(a)-(b), venue is proper in this jurisdiction because a substantial part of the events or transmissions giving rise to the claims herein occurred in this district.  Defendants contacted Tsai, a resident of St. Louis, Missouri, frequently in furtherance of their scheme.  Such communications, both via the United States mails and wires, contained fraudulent information regarding her investment.  Moreover, money

that was taken from the accounts of 15th Street Blue Island, LLC, passed through banks located in Missouri.

8.     In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and wire transmissions in interstate commerce. The same defendants engaged in interstate commerce and activities that affect interstate commerce.

<u>**PARTIES AND RELATED ENTITIES**</u>

9.     Plaintiff, Sandy Tsai ("Tsai") is a resident of the State of Missouri and a Class A Member of the 15th Street Blue Island, LLC ("15 BI").

10.     Other Class A Members of 15 BI include: Stealth Properties, LLC ("Stealth"), John Dongas ("Dongas"), Castle Realty Investments, LLC ("Castle"), Blue Island GD Investments ("BIGD"), and JSPK, LLC ("JSPK").

11.     All of the aforesaid entities and individuals comprise all of 15 BI's Class A Members.  15 BI is an Illinois limited liability company that was organized in 2006 for the purpose of acquiring real estate located at 15th Street and Blue Island Avenue in the City of Chicago, Illinois (the "Subject Property") and constructing thereon a multi-unit, mixed residential and retail commercial condominium building.  The Class A Members have jointly made substantial financial investments in 15 BI.

12.     Defendant Kargil Blue Island, LLC ("KBI") is an Illinois limited liability company and is the sole Manager and Class B Member of 15 BI.  Defendants Jerry Karlik and Keith Giles (through the Keith Giles Revocable Trust) are the remaining members of KBI. Defendant Spiros Picoulas was, at one point, a member/manager of KBI. Moreover, Defendant

Jordan Karlik was and/or is an officer and/or manager of KBI. KBI's registered agent may be served at 1530 S. State St., Suite 200, Chicago, Illinois 60605.

13.     Defendant Frankel, Giles & Associates, Inc. ("Frankel") is an Illinois company that specializes in the sale and marketing of new developments.  Frankel is also known as "Frankel & Giles," "Frankel & Giles Real Estate," "Weichert, Realtors – Frankel & Giles," and "F G Commercial," and can be served at 1456 Ridge Road, Highland Park, Illinois 60035.

14.     Defendant KGILES LLC, Inc. ("KGILES") is an Illinois corporation owned by Defendant Keith Giles.  Defendant KGILES LLC, Inc. is also known as KMG, Inc. Defendant Giles is its sole officer. Defendant KGILES advertises that Defendant Giles was the 2000 Builder of the Year for the City of Chicago and that Defendant Giles has experience in high-rise development, historic renovation, adaptive use development, student housing, construction, and marketing of high density properties. KGILES may be served at 1456 Ridge Road, Highland Park, Illinois 60035.

15.     Defendant Picoulas Enterprises Corp. ("PEC") is an Illinois corporation owned by Defendant Spiros Picoulas.  PEC may be served at 200 W. Jackson Blvd., Suite 1050, Chicago, Illinois 60606.

16.     Defendant Kargil Development Partners, LLC ("Kargil") is an Illinois limited liability company. Defendants Giles and Karlik are its sole members. Defendants Jordan and/or Picoulas are or were agents of Kargil. Kargil purports to be a real estate development firm and has conducted business in Illinois and New York. Kargil may be served at 1456 Ridge Road, Highland Park, Illinois 60035.

17.     Defendant Jerry Karlik ("Karlik") is a New York resident and is a member of (a) Defendant Kargil Blue Island, LLC, a limited liability company and its de facto co-manager, (b)

4

Defendant Frankel, Giles & Associates, Inc., and (c) Kargil Development Partners, LLC, and may be served at 33 South Service Road, Suite 108, Jericho, New York 11753.

18.     Defendant Keith Giles ("Giles") is an Illinois resident and is a member of (a) Defendant Kargil Blue Island, LLC, a limited liability company and its de facto co-manager, (b) Defendant Frankel, Giles & Associates, Inc., (c) KGILES LLC, Inc., and (d) Kargil Development Partners, LLC, and may be served at 1456 Ridge Road, Highland Park, Illinois 60035.

19.     Defendant Jordan Karlik ("Jordan") is a resident of Illinois.  He is an authorized agent and representative of Kargil Blue Island, LLC and its de facto co-manager. He may be served at 1530 S. State Street, Suite 200, Chicago, IL 60605.

20.     At all relevant times Defendant Spiros Picoulas ("Picoulas") was resident of Illinois and a former member and/or representative of Defendant Kargil Blue Island, LLC.  His last known address was 111 E. Chestnut Street, Apt. 47G, Chicago, Illinois 60611.

21.     At all times, Defendants Karlik, Giles, Jordan, and Picoulas used KBI, KGILES, Frankel, PEC, and Kargil (and perhaps other entities such as JK Equities, LLC – a real estate firm with Defendants Jordan and Karlik as its members) to perpetrate the fraud and misappropriation alleged herein.

## FACTUAL BACKGROUND

### Introduction

22.     15 BI was formed by Karlik and Giles in 2006.  Thereafter, 15 BI acquired the Subject Property, which remains its primary asset.

23.     15 BI is a "manager managed" limited liability company.  The manager has the sole and exclusive responsibility for the conduct and management of 15 BI's business.

24.     KBI has been the manager of 15 BI since its creation. Thus, KBI's members, which included Defendants Karlik, Giles, and Picoulas, were authorized to transact any and all

5

business on behalf of KBI. Moreover, as set forth in the subscription agreement for 15 BI, KBI and its members Karlik, Giles and Picoulas had the exclusive right to take all actions they deemed necessary in connection with the operation of 15 BI. Defendant Jordan was also authorized by KBI to act as a manager and transact the business of 15 BI.

25.     In 2006, Karlik, Giles, and Picoulas presented 15 BI to the persons who are now Class A Members as a prime Chicago area real estate investment opportunity.  Karlik and Giles presented the opportunity to said Plaintiffs as a proposed mixed use development at the Subject Property, consisting of a building with at least ten stores and, at minimum, 113 condominium residential units, 120 parking spaces, and 4,000 square feet of retail space ("Proposed Development").  Karlik, Giles and Picoulas also told Tsai and others that zoning changes could enable them to develop at least 130 residential units.  Karlik, Giles, and Picoulas also presented themselves to Plaintiff Tsai and others as experienced and successful real estate developers in Chicago, and Karlik and Giles as principals of Kargil Development Partners, LLC.  At times, Karlik, Giles, and Picoulas referred to Kargil Development Partners, LLC as Kargil Development Company.

26.     In response to the offer by Karlik, Giles, and Picoulas, the Class A Members of 15 BI paid approximately $3,700,000.00 to acquire their combined 46.25% interest in 15 BI and capitalize the development.

27.     Class A Members of 15 BI have a 46.25% interest in the company; KBI has the other 53.75%.

28.     Upon the subscription of the aforesaid Class A Members of 15 BI, Karlik and Giles completed the acquisition of the Subject Property in 2007 in order to commence the

development and construction of the Proposed Development.  The property was purchased for $3,720,000.

29.     To finance the acquisition of the Subject Property, KBI made a down payment of approximately $1,000,000. KBI obtained a mortgage loan from Countrywide Financial, later succeeded by Bank of America, in the approximate amount of $2,700,000 to complete the acquisition of the Subject Property.  The loan was in default in 2011, and KBI refinanced the loan in the amount of $600,000 in that year with Lakeside Bank of Chicago.  The Lakeside Bank loan is an interest only loan, and the principal balance of $600,000 is due and owing.

30.     At the time 15 BI purchased the Subject Property, the previous owner had begun the process to obtain the proper zoning and approval for the Proposed Development.  Subsequent to 15 BI's purchase, 15 BI's managers failed to obtain any construction financing or commence any construction, and failed to complete any zoning change until 2012.

31.     The Subject Property remains undeveloped.

32.     Beginning in 2007, Defendants Karlik, Giles, Jordan, and Picoulas engaged in multiple schemes to extract money from 15 BI.  As a regular part of its business, KBI funneled 15 BI's funds to Kargil, KGILES, Frankel, and Picoulas Enterprises under the guise of development fees, expenses, and/or commissions rather than using said funds to develop the Subject Property (which remains in the same state it was when bought – vacant). These entities thereafter either used the funds to finance the operations of the entities and/or funneled said funds to Defendants Karlik, Giles, Jordan, and Picoulas for their own personal use.

33.     The Defendants then transmitted and received the ill-gotten funds across interstate lines in violation of 18 U.S.C. §§ 2314 and 2315.

34.     The scheme, which lasted at least five years (2007-2012), was accomplished through acts of mail and wire fraud and which included at least the following acts:

- Mailing and/or transmitting by electronic communications multiple phony invoices for services that were never performed;

- Mailing or transmitting electronic communications containing letters that fraudulently depicted the status of the Proposed Development;

- Sending multiple letters through the United States mails fraudulently depicting the status of the Proposed Development;

- Mailing and/or transmitting by electronic means 15 BI funds to Defendants for payment for services that were never performed; and

- Engaging in multiple telephone conversations in which Karlik, Giles, Jordan, and/or Picoulas (a) fraudulently portrayed the real estate venture and (b) fraudulently confirmed the status of the Proposed Development and the use of funds.

**The 15 BI Operating Agreement**

35.     The operation and management of 15 BI is governed by the "Operating Agreement of 15th Street Blue Island LLC" dated September 26, 2006 ("Operating Agreement"). The Operating Agreement was prepared and drafted at the direction and with the approval of Karlik and Giles.

36.     Section 5.1.2 of the Operating Agreement vested the Manager, KBI, with full and exclusive authority to manage, control, administer, and operate the business and affairs of 15 BI. Thus, the Defendants had full and complete access over the corporate accounts and affairs of 15 BI with no input from the Class A Members.

37.     The Operating Agreement (Section 5.3.2) also barred KBI from receiving any compensation for services performed for 15 BI. Thus, the Class A Members provided the capital to operate 15 BI and the Class B member provided its expertise to develop the Subject Property.

8

38.     Nevertheless, the Operating Agreement did allow the Manager to obtain a prescribed fee/commission in conjunction with the success of the Proposed Development. In particular, Section 5.4.4 provides in pertinent part the following:

> Notwithstanding anything contained in Section 5.3.2 hereinabove, the Manager shall be entitled to be paid the following: (i) a development fee (the "Development Fee") equal to three percent (3.0%) of the aggregate gross sales price of all condominium, townhome and parking units and/or single family homes sold by the Company for services provided by the Manager in connection with the development of the Property, administration of the closing and acting as a liaison between the Company, the real estate brokers and condominium purchasers; and (ii) a loan guaranty fee ("Guaranty Fee") in the amount equal to one percent (1.0%) of the maximum amount which the Company is allowed to borrow under any loan(s) obtained by the Company in connection with the development of the Property, administration of the closing and acting as a liaison between the Company, the real estate brokers and condominium purchasers…In no event shall the Development Fee be paid to the Manager prior to the Company securing its construction loan.

39.     Thus, KBI's compensation as Manager of 15 BI was capped by the Development Fee and Guaranty Fee set forth in Section 5.4.4.

40.     KBI and the Defendants skirted Section 5.4.4 by "hiring" an affiliated company, Kargil, Frankel, and/or KGILES to "develop" the Subject Property. These other companies charged "development fees" without regard to Section 5.4.4. Thus, the same underlying members of KBI, Defendants Karlik, Giles, Jordan and/or Picoulas, received "development fees" through their affiliated companies, Defendants Kargil, Frankel, and/or KGILES.

41.     Although the Operating Agreement in Section 5.3.3 provides that 15 BI could enter into agreements for services with affiliates of KBI at the sole discretion of KBI, such agreements had to be negotiated on an arm's length basis at prevailing competitive rates. That did not occur.

42.     For example, Section 5.4.5 of the Operating Agreement specifically delineates the amount of compensation the real estate broker could attain.  In fact, the Operating Agreement

specifically identified that Frankel was to act as the broker and provided set fees Frankel could earn.  Section 5.4.5 provides in pertinent part the following:

> The Company intends to enter into an exclusive listing agreement with Frankel, Giles & Associates, Inc. (an Affiliate of the Class B Member) to list, market and sell residential units and parking spaces which the company is intending to market and sell in connection with the development of the Property. The listing agreement between Frankel, Giles & Associates, Inc. and the Company will be upon commercial reasonable terms and conditions. The listing agreement shall provide that Frankel, Giles & Associates, Inc. shall be entitled to receive a brokerage commission in an amount that is no more than three percent (3.0%) of the gross sales price of each condominium, townhome, single family home and parking unit sold by the Company. An additional brokerage commission of of up to two and one-half percent (2.5%) will be paid by the Company if a cooperating broker was the procuring cause of the sale a condominium, townhome, single family home or parking unit.

43.     Instead of abiding by Section 5.4.5, Frankel invoiced and charged 15 BI almost $270,000 for unknown services.  With no unit ever being sold, Frankel is not entitled to any fees/commissions.

44.     Pursuant to Section 5.4.4 and 5.4.5, the Class B Member and its managers, individually and through its affiliate Frankel, stood to earn, at minimum, 1% of the maximum amount the Company was allowed to borrow (the Company expected to borrow at least $36,000,000) and 6% of the gross sales price of each unit (8.5% should the unit be sold through a cooperating broker), prior to any profit splitting related to such sales between the Class A Members and Class B Member.

### Defendants' Scheme to Defraud

45.     Karlik, Giles, Picoulas, and Jordan, while serving in their capacity as persons controlling KBI, engaged in the systematic looting of the assets of 15 BI and the conversion of those assets for the sole and exclusive benefit of themselves and the entities related to them. Based upon a preliminary and incomplete examination of 15 BI's financials from inception through November 2013, in addition to the down payment required to purchase the Subject

Property and mortgage and interest payments related to the notes, Defendants appear to have expended only $450,000 over the last five years from the capital account to develop the property to which the Class A Members had contributed $3.7 million. Such expenditures included paying for architectural fees and fees associated with zoning issues. The remaining funds on hand now amount to approximately $160,000.  The preliminary investigation reveals that Defendants have misappropriated at least $1.2 million.

A.      **Improper Payments to Picoulas**

46.     KBI was originally described as including Picoulas of Chicago, Illinois as a member.

47.     The subscription agreement signed by Plaintiff lists Picoulas as a member of KBI.

48.     In 2007, KBI completed the acquisition of the Subject Property for the development project.  However, at the same time, KBI began making substantial payments to Picoulas' company Picoulas Enterprises from 15 BI's capital account.

49.     Between February 2007 and January 2008, the transfers from 15 BI to Picoulas Enterprises totaled $605,000, none of which are explainable as expenditures related to 15 BI's development project.

50.     After January 2008, Picoulas' membership in KBI "terminated."

51.     In December 2011, long after Picoulas' KBI membership was terminated, Giles informed the Class A Members that $150,000 paid to Picoulas Enterprises via a wire transfer on or about January 27, 2008 to Picoulas' Citibank account located in O'Fallon, Missouri was "not related" to 15 BI, but was a loan. KBI had ledgered said payment as a "receivable" from Picoulas Enterprises on 15 BI's financial statements, which were produced to Plaintiff in 2012.  Said

$150,000 "receivable" has never been repaid to 15 BI. Upon information and belief, the Defendants did not expect Picoulas to repay the "loan."

52. The remaining $455,000 paid to Picoulas was also unrelated to the development of the Subject Property. Instead, as set forth in the ledgers, 15 BI paid Picoulas Enterprises "finder's fees" and/or "commissions" as a reward for obtaining the Class A Members' investment into 15 BI.

53. Specifically, 15 BI paid Picoulas Enterprises the following "finder's fees/commissions":

- $100,000 payment on or about February 19, 2007;

- $50,000 payment on or about April 27, 2007 (though the ledger indicates that this payment related to a commission, Defendant Karlik identified that this payment was a loan in an April 27, 2007 email to Laura Galusha, an employee of Frankel who processed the payment);

- $10,000 payment on or about May 15, 2007;

- $25,000 payment on or about June 27, 2007;

- $150,000 wire transfer on or about July 17, 2007; and

- $120,000 wire transfer to Frankel related to Picoulas on or about September 24, 2007.

54. In order to receive the above-referenced finder's fees, Picoulas and/or PEC submitted a form (check request) seeking payment to Karlik, Giles, and/or Jordan, who had to provide written authorization prior to the disbursement of such funds. These requests were thereafter authorized and checks signed by either Karlik, Giles, or Jordan were thereafter issued. Wire transfers were also approved in the same format whereupon a Frankel and/or Kargil

12

employee, Laura Galusha and/or others, would submit transfer instructions to the bank to remove funds from 15 BI's capital account and to the account of Picoulas and/or PEC.

55.     Additionally, at times, Giles and Karlik would personally approve of a wire transfer via email.  For example, on September 24, 2007, Giles emailed Laura Galusha an instruction to transfer $120,000 into Frankel's account for purposes of a commission and then instructed her to write a check from Frankel's account to Picoulas for $96,000.  Karlik was copied on that email.

56.     At no point were Class A Members ever informed that over 16% of their investment would be used to pay for finder's fees/commissions to a purported member of KBI (and thus one of the managers of 15 BI). Such expenditure had nothing to do with the actual development of the Subject Property.

57.     Instead, Class A Members were specifically told (via the Operating Agreement, on the telephone, and in meetings) that the Class B Member and its affiliates would receive no financial benefit other than those derived from the actual sale of the condominium units and the fees specifically set forth in the Operating Agreement.

58.     Thus, with the approval of Defendants KBI, Karlik, Giles, and/or Jordan, 15 BI transferred at least $605,000 to PEC and Picoulas through both the US Mail and wires.

59.     Defendants sought to keep the payments and purpose of the same secret from Plaintiffs.

**B.**     **Improper Payments to Kargil and Frankel**

60.     Since the inception of 15 BI, KBI, the manager of 15 BI, has had exclusive access to and control of the capital account.  As a result, Karlik, Giles, Picoulas, and Jordan, as members and/or representatives of KBI, have had full access to and use of the capital account.

61.     Starting around November 7, 2007, Defendants wrongfully and secretly arranged for alleged "commissions" and/or payments to be paid to Frankel, Karlik and Giles' real estate company, and Kargil from 15 BI funds, even though those payments were not disclosed to 15 BI Class A Members.

62.     These "commission" payments were also excessive and commercially unreasonable.  The payments were unknown to Plaintiff until 2012, and were concealed by KBI and the other Defendants until that year.

63.     Since 2007, KBI has withdrawn funds from the 15 BI capital account for personal and/or corporate use by Defendants KBI, Karlik, Jordan, Picoulas, Giles, Kargil, Frankel, Picoulas Enterprises, and KGILES and for purposes unrelated to 15 BI.  Those withdrawals exceeded approximately $960,000.00.

64.     These withdrawals were not communicated to Class A Members in advance of being made and failed to comply with Sections 5.3.2, 5.3.3, 5.4.4, and 5.4.5 of the Operating Agreement.

65.     Some of the withdrawals were paid to Karlik, Giles and Jordan directly, or indirectly through Frankel and Kargil, and the funds were thereafter expended for personal purposes by and/or on behalf of Defendants, and not for any purpose related to 15 BI.

66.     Any such withdrawals through Frankel or Kargil were not pursuant to arms-length agreements, as required by Section 5.3.3 of the Operating Agreement, and further did not comply with Sections 5.4.4 and 5.4.5 of the Operating Agreement, which set forth the basis of any payment to the developer and Frankel respectively, and were expressly made to attempt to circumvent the requirements of Sections 5.3.2, 5.4.4, and 5.4.5 of the Operating Agreement.

### a.      Kargil

67.      In particular, Section 5.4.4 of the Operating Agreement specifically delineated that KBI, as Manager and developer of 15 BI, would receive a Development Fee (3% of the aggregate gross sales price of each unit sold) and Guaranty Fee (1% of the maximum amount of money 15 BI is allowed to borrow). Based on estimates provided by KBI and its affiliates, a construction loan of approximately $36,000,000 was required to finance the Proposed Development; thus, KBI expected to receive at least $360,000 (Guaranty Fee) in addition to the 3% of the aggregate gross sales price of each unit sold.

68.      In an effort to circumvent the prescribed fees, and in violation of Section 5.3.3 of the Operating Agreement, KBI "contracted" with Kargil (though no written contract exists) to assist in the development of the Subject Property. Thus, Kargil invoiced and procured funds under the guise of development fees and expenses labeled as "chargebacks" by Defendants.

69.      Through the use of the US Mails and wires, 15 BI, through its manager KBI, paid Kargil the following "development fees" and/or "chargebacks":

- $40,000 wire transfer on or about September 12, 2007;

- $10,000 wire transfer on or about September 18, 2007;

- $20,000 wire transfer on or about September 25, 2007, which was actually for and related to the Prairie District Lofts – another development project of Kargil wholly unrelated to 15 BI;

- $60,000 wire transfer on or about April 9, 2008;

- $20,000 wire transfer on or about May 15, 2008;

- $20,000 wire transfer on or about July 10, 2008;

- $20,000 wire transfer on or about February 13, 2009; and

- 42 separate payments for "chargebacks" from November 9, 2006 to January 12, 2011 totaling $56,385.77.

70.     Kargil's "chargebacks" consisted of "expenses" such as travel, personal limousines, restaurants, health club dues, cell phone usage, political contributions on behalf of members of Kargil, IT services, and electric service. Though Kargil invoiced 15 BI for the supposed services, no or little back-up in the form of actual invoices from these entities, i.e., the limousine company, ComEd bill, cell phone bill, etc. documenting how these expenses relate to 15 BI has been provided and/or exist. Included in the "chargebacks" were invoices and/or requests for payment from KGILES for expenses such as political contributions, golf, travel, accounting work unrelated to 15 BI, and meals (in total, at least $3,683.09 ultimately billed and paid for by 15 BI between August 1, 2007 and December 30, 2011).

71.     In order to be paid the above-referenced "chargebacks", Kargil, at times, submitted a check request. Each request required written authorization from Karlik, Giles, and/or Jordan.  After the check request was authorized, 15 BI sent a check, signed by either Karlik, Giles, or Jordan, to Kargil.

72.     Wire transfers for alleged developer fees were also approved in the same format whereupon a Frankel and/or Kargil employee, Laura Galusha and/or others, would submit transfer instructions to the bank to remove funds from 15 BI's capital account and to the account of Kargil after receiving direction from Karlik, Giles, Jordan, and/or Picoulas.

73.     In addition, Kargil would submit invoices for "chargebacks" only seeking payment for the listed "expenses" contained therein.  For some of these chargebacks, Defendants Karlik, Giles, and/or Jordan would submit via fax the invoice and a draw request to Countrywide Bank/Bank of America seeking funds. Though the Kargil invoice and draw request did not

16

contain any back-up demonstrating how the listed expenses related to 15 BI, Countrywide/Bank of America would process and allow such payments.

74.     In the end and through the use of the US Mail and wires, 15 BI paid Kargil, at minimum, $190,000 in illegitimate development fees wired to Kargil and $56,385.77 in illegitimate expenses without informing Plaintiffs of the same.

### b.     Frankel

75.     Section 5.4.5 of the Operating Agreement specifically delineated the amount (3% of the gross sales price of each unit plus an additional 2.5% if the sale was procured through a "cooperating broker") Frankel was to earn in relation to its work for the Proposed Development.

76.     Though the Operating Agreement stated that 15 BI intended to enter into an exclusive listing agreement with Frankel, no such written agreement exists.

77.     Nonetheless, Frankel still charged 15 BI development fees and other undefined payroll fees related to the Proposed Development even though no unit was ever sold. In fact, the Proposed Development never broke ground.

78.     Through the use of the US Mails and wires, 15 BI, through its manager KBI, paid Frankel the following illegitimate development fees and/or "chargebacks":

- $30,000 wire transfer on or about August 14, 2008;

- $20,000 wire transfer on or about March 13, 2009 for "overhead";

- $35,000 wire transfer on or about May 7, 2009;

- $10,000 check to Frankel on or about June 3, 2009;

- $10,000 wire transfer on or about November 4, 2009; and

- 41 separate payments for "chargebacks" from September 14, 2007 to June 9, 2012 totaling $164,474.63.

17

79.     Frankel's "chargebacks" consisted of "expenses" such as personal limousines, restaurants, health insurance for Karlik, Giles and other Frankel employees, Frankel's payroll, and Frankel's payroll taxes. Though Frankel invoiced 15 BI for these alleged services, no or little back-up in the form of actual invoices from these entities, i.e., the limousine company, health insurance bill, payroll and payroll taxes, cell phone bill, etc. documenting how these expenses relate to 15 BI has been provided and/or exist.

80.     Upon information and belief, the wire transfers dated August 14, 2008, March 13, 2009, May 7, 2009, June 3, 2009, and November 4, 2009 were used by Frankel to cover potential payroll shortfalls and other expenses that were independent of 15 BI and/or not authorized by the Operating Agreement.

81.     For example, as set forth above, on May 7, 2009, $35,000 was wired from the accounts of 15 BI to Frankel. The purpose of this wire transaction was not to cover the development of the Subject Property, but to assist Frankel in its payroll obligations.  On May 4, 2009, Laura Galusha emailed Karlik and Giles stating that Frankel needed $23,000 to cover payroll due May 8, 2009.  She indicated that in February she transferred $20,000 from 15 BI to cover Frankel's payroll (this actually occurred on March 13, 2007).  Karlik responded via email minutes later directing her to transfer money from 15 BI to Frankel to cover payroll. Ms. Galusha responded that she would transfer $35,000 from 15 BI's account to Frankel's account to cover payroll (which was then done on May 7, 2009).

82.     Additionally, on June 3, 2009 a check was issued to Frankel for the amount of $10,000.  The purpose of this check was not to cover the development of the Property, but to again bankroll Frankel's payroll obligations.  On June 2, 2009, Ms. Galusha emailed Karlik and Giles informing them that Frankel had two payrolls coming due: $9,400 due on June 5, 2009 and

18

$26,800 due June 19, 2009 AND that Frankel did not have enough funds in its bank account to cover these transactions as Frankel only had $7,000 in its bank account. Karlik responded via email to Ms. Galusha directing her to transfer $10,000 from 15 BI to cover Frankel's June 5, 2009 payroll shortfall.

83.     There exists no reason for 15 BI to pay these fees and "expenses" as (a) they run counter to the prescribed fees provided to Frankel outlined in the Operating Agreement and (b) they run counter to industry norms.

84.     Frankel procured these illegitimate development fees and "chargebacks" in the same manner as Kargil.

85.     In the end and through the use of the US Mail and wires, between September 14, 2007 and June 9, 2012, Frankel, at minimum, unlawfully procured $269,474.63 from 15 BI.

**C.     Improper Payments to Jordan**

86.     Section 5.3.2 of the Operating Agreement bars the Manager from receiving any compensation for services performed on behalf of 15 BI unless approved by the Members of 15 BI.

87.     Jordan, on behalf of KBI, acted as one of the managers of 15 BI.

88.     In fact, at times, Jordan signed contracts as a representative of 15 BI/KBI.

89.     Jordan also directed the distribution of funds from the accounts of 15 BI.  For example, Jordan would send emails to Laura Galusha directing her to make political contributions to various entities.  Jordan would also fax requests to Countrywide Bank/Bank of America seeking draws from the accounts of 15 BI.

90.     Even though the acting manager was not to receive compensation (with the exception of the Developer's Fee and Guaranty Fee), the financial ledgers of 15 BI reveals that Jordan received $3,900.25 in compensation (identified as 1099s in ledgers) from 15 BI.

91.     At times, Jordan would submit a timesheet documenting his time and total hourly fee.  A check would then be issued to Jordan reflecting this fee.

92.     Such payment defies the explicit restrictions set forth in 5.3.2 of the Operating Agreement.

93.     Moreover, Jordan submitted check requests for payment related to expenses such as cab fares, travel, and traffic tickets. Such check requests were processed in the same manner as Kargil and Frankel's check requests detailed above.

94.     Unless approved by the Members, the Manager shall not be entitled to compensation for services performed for the Company.

95.     There exists no reason for 15 BI to pay these fees and "expenses" as they run counter to the prescribed fees outlined in the Operating Agreement.

96.     Through the use of the US Mail and wires, between July 1, 2008 and July 2, 2012 15 BI paid Jordan, at minimum, $4,541.94 in unaccounted for fees and expenses without informing Plaintiffs of the same.

**D.**     **Other Unexplained Payments**

97.     In addition to the payments outlined above, Defendants authorized several other unaccounted for disbursements from the accounts of 15 BI.

98.     In particular, on September 26, 2007, $29,980 was wired from the accounts of 15 BI to cover a loan to William Gutrich for purposes wholly unrelated to 15 BI.  Karlik authorized this loan in a September 26, 2007 email to Laura Galusha.

99.     A similar event occurred on March 13, 2009 when 15 BI loaned $6,600 to 211 East LLC, an LLC wholly unrelated to 15 BI.

100.    On March 19, 2008 a check for $7,500 was issued to Kahr Real Estate Services ("Kahr"), located 55 Broad Street, 7th Floor, New York City, New York.  Kahr's invoice was dated March 20, 2008 and was directed to Kargil for the "Excel Training" for two students. In an email dated March 18, 2008, Karlik instructed Lee Eisenstein, a Kargil employee, to issue a check from the accounts of 15 BI to cover the aforementioned training.  Handwritten notes on a copy of the email reveal that this "expense" was to be labeled a "consultant's fee".

101.    Additionally, 15 BI paid the annual filing fees, most recently in September 2013, for KBI to the State of Illinois and the related legal expenses incurred for the same.  In doing so, 15 BI sent payment via mail to Bronson & Kahn (law firm handling the reports) and the State of Illinois.

102.    Clearly, through the use of the United States mail and wires, Defendants misdirected 15 BI's funds to others and used the accounts of 15 BI as a slush fund to finance other projects and/or entities.

**E.      Additional Predicate Acts Concealing the Scheme**

103.    Soon after purchasing the Subject Property, Defendants apparently abandoned pursuit of the Proposed Development despite the mandate of the 15 BI Operating Agreement.  In general, Defendants represented in various phone calls, emails and letters to Plaintiff and her representatives (all located in St. Louis, Missouri), that an adjacent real estate development, a changed real estate market due to the 2008 recession, reduced business activity and tightening of the credit market of the recession, and various other events rendered the Proposed Development unfeasible.

104.    Defendants, however, continued to maintain to Class A Members that various profitable market and development alternatives were available for 15 BI, which included leasing to neighboring University of Illinois Chicago, sale to not-for-profit entities, construction of rental apartments, development of "senior housing", and other alternatives.  Defendants, however, never committed to any particular alternative.

105.    In furtherance of the scheme and as additional predicate acts, since December 2007 Defendants have repeatedly communicated to the Class A Members via letter (including letters dated December 4, 2007, March 14, 2008, December 19, 2008, October 5, 2009, January 12, 2010, April 28, 2010, August 30, 2010, and April 27, 2012) that 15 BI has retained value, remains a positive, profitable investment, and can enjoy a profitable alternative to the original Proposed Development.

106.    However, despite Defendants' aforesaid representations to Plaintiff and the other Class A Members, in 2011 Defendant Giles informed one of the members of 15 BI, JSPK, that 15 BI was a hopeless loss and that he should probably write off his entire investment in 15 BI.

107.    Since 2008, Defendants have failed to adhere to the purpose of 15 BI and advance the Proposed Development. But instead of dissolving 15 BI, Defendants have continued 15 BI for the purpose of using its cash for their own purposes other than the interest of 15 BI, and have intentionally concealed this strategy from Plaintiff.

108.    In addition, Defendants have concealed the fact that they have, since 2008, procured additional "investors" in 15 BI in violation of the anti-dilution provisions of the Operating Agreement.

109.    In furtherance of this scheme, instead of selling interests in 15 BI, Defendants sold interests in KBI to Thomas Gangas and Peter Housakos. The sale of interests in KBI only

served to perpetuate the scheme to defraud the investors, in effect, using the Proposed Development as money-making venture serving only to line Defendants' pockets. This scheme would have continued unless Defendants were caught.

110.    Moreover, in letters directed to some or all of the Class A Members, including Plaintiff, Defendants refused to allow the Class A Members to sell their interests in the Company.

## Money Laundering Scheme

111.    Not only did Defendants Kargil, Frankel, KGILES, and Picoulas Enterprises (all distinct legal entities) benefit through this scheme, but Giles, Karlik, Jordan, and Picoulas personally benefited from this money laundering scheme.

112.    Defendants Kargil and Frankel and upon information and belief, KGILES and Picoulas Enterprises maintained separate bank accounts.  Once 15 BI's funds were transferred (either via wire or check) to these bank accounts, Defendants Giles, Karlik, Jordan, and Picoulas had unfettered access to these funds as members and/or managers of these companies.

113.    Defendants Giles, Karlik, Jordan, and Picoulas could therefore withdraw money that was fraudulently obtained from 15 BI.

## COUNT I
### VIOLATIONS OF RICO § 1962(c)
#### (Against Defendants Karlik, Giles, Picoulas, and Jordan)

114.    Plaintiff incorporates by reference paragraphs 1 through 113 above as paragraph 114 of this Count I.

115.    KBI was at all relevant times an enterprise engaged in the lawful business of the development of the Subject Property and managing 15 BI, and whose activities affect interstate commerce.

116.    Karlik, Giles, Picoulas, and Jordan conducted and participated in the conduct of the KBI enterprise for the unlawful purpose of defrauding the Class A Members of 15 BI,

including Plaintiff Tsai. Specifically, Karlik, Giles, Picoulas, and Jordan conducted the KBI enterprise in several schemes to fraudulently make payments from 15 BI for services that were never performed so that Karlik, Giles, Picoulas, and Jordan could keep the proceeds that resulted from said transfers.

117.    The schemes Karlik, Giles, Picoulas, and Jordan orchestrated at KBI, which affected several victims were so numerous and pervasive, that KBI's regular way of doing business revolved around Karlik, Giles, Picoulas, and Jordan's schemes to defraud the Class A Members, including Plaintiff Tsai.

118.    Pursuant to and in furtherance of those schemes, KBI, Karlik, Giles, Picoulas, and Jordan committed several acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, including those discussed in the paragraphs above.

119.    In addition, Karlik, Giles, Picoulas, and Jordan have transported and received misappropriated funds across interstate lines in violation of 18 U.S.C. §§ 2314 and 2315.

120.    Karlik, Giles, Picoulas, and Jordan have directly and indirectly conducted and participated in the conduct of the KBI enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

121.    The racketeering acts have been continuous and related, and are of such nature that they would have tended to continue indefinitely, and thus constitute a pattern of racketeering pursuant to 18 U.S.C. § 1961(5).

122.    As the direct and proximate cause of the racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in her business and property in that, without limitation, among other things, she has lost substantial monies and investment opportunities in connection with and as a result of her payments to 15 BI that KBI thereafter misused.

## COUNT II
## VIOLATIONS OF RICO § 1962(c)
### (Defendants KBI, Frankel, Kargil, PEC, and KGILES)

123.    Plaintiff incorporates by reference paragraphs 1 through 113 above as paragraph 123 of this Count II.

124.    At all relevant times, 15 BI, KBI, Frankel, Kargil, PEC, and KGILES were an association-in-fact and "enterprise" engaged in the development of the Subject Property, and whose activities affect interstate commerce.

125.    Defendants KBI, Frankel, Kargil, Picoulas Enterprises, and KGILES agreed to and did conduct and participate in the conduct of this enterprise pursuant to several schemes to fraudulently procure payments from the bank account of 15 BI whose funds were contributed solely from the Class A Members, including Plaintiff Tsai, for illegitimate or unlawful fees and charges.

126.    Defendants KBI, Frankel, Kargil, PEC, and KGILES are each legally distinct entities who each, in their own manner, profited in their own distinct way. Frankel, Kargil, KGILES and PEC used such funds wrongfully procured from the bank account of 15 BI to fund their businesses. For example, Frankel used the wrongfully procured funds to meet its payroll obligations. Additionally, funds wired and/or provided to Frankel, Kargil, PEC, and/or KGILES were, at times, thereafter transmitted to and/or funneled to Karlik, Jordan, Giles, and Picoulas.

127.    Pursuant to and in furtherance of the fraudulent schemes, Defendants KBI, Frankel, Kargil, PEC, and KGILES and their employees and representatives committed multiple acts of mail fraud and wire fraud including those discussed in paragraphs above.

128.    In addition, KBI, Frankel, Kargil, PEC, and KGILES transported and received misappropriated funds across interstate lines in violation of 18 U.S.C. §§ 2314 and 2315.

129.     KBI, Frankel, Kargil, PEC, and KGILES have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

130.     The racketeering acts have been continuous and related, and are of such nature that they would have tended to continue indefinitely, and thus constitute a pattern of racketeering pursuant to 18 U.S.C. § 1961(5).

131.     As the direct and proximate cause of the racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in her business and property in that, without limitation, among other things, she has lost substantial monies and investment opportunities in connection with and as a result of her payments to 15 BI that KBI thereafter misused and misdirected towards KBI, Frankel, Kargil, Picoulas Enterprises, and KGILES.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

A.     A judgment against Karlik, Giles, Jordan, Picoulas, KBI, Frankel, Kargil, Picoulas Enterprises, and KGILES holding that each violated and is jointly liable to Plaintiff pursuant to the Racketeer Influenced and Corrupt Organizations Act;

B.     Entry of judgment for compensatory damages for Defendants' violations of RICO, plus treble damages, attorney's fees and costs of this action, all provided by statute as a result of Defendants' violations of 18 U.S.C. § 1962; and

C.     Such other and further relief as the Court deems just.

070305/465264-46414200.2

Respectfully Submitted,


By:  /s/Peter A. Corsale
     PETER A. CORSALE (#57220)
     JOHNNY S. WANG  (#57748)
     100 South Fourth Street, Suite 1000
     St. Louis, Missouri  63102
     (314) 889-8000
     Fax No. (314) 231-1776

Attorneys for Plaintiff

070305/465264-46414200.2